IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2003 Session

## STATE OF TENNESSEE v. KELVIN HOBSON

**Appeal from the Criminal Court for Davidson County**
**No. 2000-D-1999     J. Randall Wyatt, Jr., Judge**

---

**No. M2002-01462-CCA-R3-CD - Filed December 18, 2003**

---

A Davidson County Criminal Court jury convicted the defendant, Kelvin Hobson, of two counts of aggravated sexual battery, a Class B felony, and the trial court sentenced him as a violent offender to concurrent ten-year sentences.  The defendant appeals his convictions, claiming that (1) the evidence is insufficient; (2) the trial court improperly allowed the state to cross-examine him about prior bad acts; (3) the trial court improperly allowed state witnesses to give rebuttal testimony about his prior bad acts and his character for truthfulness; (4) the trial court improperly refused to give a curative instruction after the state shifted the burden of proof during closing argument; and (5) the trial court should have granted his new trial motion because the jury foreman mistakenly told other jurors during deliberations that the defendant would serve only probation for his aggravated sexual battery convictions.  We conclude that the trial court committed reversible error by allowing state witnesses to testify on rebuttal about the defendant's prior bad acts and his character for truthfulness.  Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed, Case Remanded

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Glenn R. Funk and Cynthia M. Fort (on appeal), Nashville, Tennessee, for the appellant, Kelvin Hobson.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Brian Keith Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant was charged with sexually abusing his girlfriend's niece and his girlfriend's two granddaughters.  L. M., who was fifteen years old at the March 2002 trial, testified that Annie

Harvey was her aunt and that the defendant was Ms. Harvey's boyfriend. She said that the defendant lived with her aunt in Nashville and that she had known him since she was about five years old. She said that when she was about nine years old, she spent almost every weekend at Ms. Harvey's house and that her cousins K. H. and M. H. also spent nights there with her. She said she and her cousins would be alone with the defendant sometimes because her aunt was at work or asleep. She said that her aunt and the defendant owned a box of sex toys and that the defendant would rub the toys on her. She said that one of the toys was a vibrator and that the defendant would masturbate while L. M. rubbed herself with it. She said that the box also contained photographs of her aunt naked and that the defendant showed her the photographs.

L. M. testified that the defendant would rub his penis against her genitals while her clothes were off but that he did not insert his penis into her vagina. She said that she would perform fellatio on him while he performed cunnilingus on her and that the defendant performed oral sex on her more than three times. She said that the defendant also stuck his fingers into her vagina once and that he touched her labia with his toe twice when she was about nine years old. She said that the defendant did not stick his toe inside of her but that he stuck the tip of his penis into her rectum. She said that the defendant also rubbed his penis on K. H. and M. H. and that he made them perform fellatio on him. She said that the four of them would watch pornographic videotapes together and that the defendant wanted to take photographs of her naked but that she refused.

L. M. testified that the defendant gave her and her cousins gifts in order to keep them from revealing the abuse and that she did not tell anyone about the abuse because the defendant told her no one would believe her. She said that she was older than K. H. and M. H. and that she told them not to tell anyone because no one would believe them. She said that she never talked to the police but that she told a woman at school about the abuse when she was thirteen years old. She said that later, Kate Greer from the Department of Children's Services (DCS) talked to her. She said that Ms. Greer wanted her to wear a wire under her clothes and visit the defendant at work but that she refused. She said a doctor never examined her.

On cross-examination, L. M. testified that she and her aunt had a close relationship and that her aunt liked for her to visit. She said that in addition to weekends, she also spent time at her aunt's home after school. She said that every time she was at Ms. Harvey's house, some type of sexual activity occurred with the defendant. She said that after she revealed the abuse, she continued to go to Ms. Harvey's house even though she was not supposed to go there. She said that she never asked her aunt if she could live at her aunt's house and that when she was twelve or thirteen, she stopped going to her aunt's house completely. She said that after she revealed the abuse, she was sent to Vanderbilt for counseling and a group home. She said that the defendant ejaculated often during the abuse and that he could ejaculate up to four times each night.

K. H., who was eleven years old at the time of trial, testified that the defendant would touch her buttocks with his hand and his penis while her clothes were off. She said that the defendant performed cunnilingus on her and that he made her touch his penis with her mouth one time. She said that the defendant would touch her genitals with his penis and that his penis would go "in and

out." She said L. M. saw the defendant do these things to her. She said that she saw the defendant touch M. H.'s buttocks and genitals with his hand and that she saw the defendant touch L. M.'s buttocks with his hand. She said that her grandmother, Annie Harvey, was always away from home when the abuse occurred and that the defendant never bought or gave her anything. She said she told her mother about the abuse.

On cross-examination, K. H. acknowledged that she told the defendant's attorney no one had ever touched her. She also acknowledged being examined by a doctor but did not remember telling the doctor that no one had ever touched her genitals. She said she never saw the defendant ejaculate. On redirect examination, K. H. said she told the defendant's attorney that no one touched her because she was scared. She said L. M. never told her to say bad things about the defendant.

Sue Ross, a pediatric nurse practitioner, testified that the DCS referred K. H. to her and that she examined the child. She said that K. H was nine years old at the time of the examination and that K. H.'s hymen had an unusual indentation. She said that although K. H. had "a very concerning exam," she could not say the indentation was caused by sexual abuse. She said that the indentation could have resulted from a penis or a finger coming into contact with K. H.'s genitalia or that it could have been the result of K. H.'s normal development. On cross-examination, she said that K. H.'s hymen was not torn and that she did not see any bruises, abrasions, or scars on K. H. She acknowledged that K. H. never indicated she had been touched inappropriately.

M. H., who was nine years old at the time of trial, identified the defendant in court and testified that she knew him as "Bone." She said that she met Bone at Annie Harvey's house but that she did not know if he lived there. She acknowledged that she would spend the night at her grandmother's house and that L. M. and K. H. also spent the night there. She said that the defendant would touch her buttocks with his penis while both of them had their clothes on, that the defendant touched her "private part" over her clothes with his hand, and that he touched her private part with his mouth while her clothes were off. She also said she saw the defendant touch L. M. and K. H. She said the defendant never told her not to tell people about the abuse. On cross-examination, M. H. testified that she never saw the defendant's penis because his clothes were always on.

Annie Mae Harvey testified that she had known the defendant all of her life and that they had a romantic relationship for about eleven years. She said that her niece and two granddaughters would spend the night at her house and that the defendant also would be there. She said that she kept a Polaroid instant camera and a box of sex toys in her bedroom but that the box was locked and she always had the key. She said that she and the defendant owned sexually explicit videotapes and that she was unaware of the children ever watching them. She said that the defendant took photographs of her naked with the instant camera, that she kept the photographs in the locked box, and that she never showed the photographs to the children. She said that after she learned the police were investigating the defendant, they stopped seeing each other. She said that their romantic relationship ended in 1998 or 1999 and that the defendant never spent the night at her house after that time. She said that at some point, the police asked to search her house but that she refused. She said that the

police later returned with a search warrant, that she telephoned the defendant, and that the defendant arrived at her house during the search.

On cross-examination, Ms. Harvey testified that she regularly spent money on L. M., that L. M. never showed any reluctance to stay at her house, and that L. M. asked to live with her in 1996 or 1997. She said that the defendant was living with her at the time and that she did not let L. M. live with them because she had to work and could not watch L. M. She acknowledged that L. M. wanted to "run around the neighborhood" but that she would not let her. She said that the defendant moved out of her house in 1997 but that they continued to see each other in 1998 and 1999 as friends. She said that the defendant would give her rides to work and run errands for her but that he never spent the night at her home. She said that she had custody of K. H. when K. H. was five to eleven years old and that after the defendant moved out, K. H. and M. H. moved in with her.

On redirect examination, Ms. Harvey testified that she may have told the police when they searched her house in January 2000 that the defendant was her boyfriend. She said that sometimes when she went to bed, the defendant would stay up with the children. She said that she did not know of any conflicts L. M., K. H., or M. H. had with the defendant and that she did not know why they would falsely accuse him of sexually abusing them. She said that the girls never told her about the abuse and that the defendant never had the opportunity to abuse them in her home after he moved out in late 1997. She said, though, that sometimes when the defendant picked her up from work in 1998 and 1999, L. M. would be with him.

Sheronda McNeal testified that she is Annie Harvey's niece and that she was twenty-one years old at the time of the trial. She said that on Labor Day 1999, she was at another aunt's house and that the defendant dropped off K. H. She said that K. H. was nervous and that K. H. told her the defendant had tried to make K. H. put her mouth on his penis earlier that day. She said that she took K. H. to K. H.'s mother and that K. H. told her mother about the abuse. She said that the next day, she went with K. H. to the police and reported the incident.

Detective Kristin Vanderkooi Dyer of the Nashville Metropolitan Police Department testified that on August 20, 1999, she followed up on a DCS report that alleged L. M. had been sexually abused. She said that she and Kate Greer from the DCS met with L. M. and that L. M. was angry they had come to talk to her. She said L. M. was hostile, did not want to talk, and told them, "You're not going to be able to help me." She said that L. M. calmed down but that L. M. still would not talk to them about the abuse. She said L. M. was worried about Annie Harvey and the fact that L. M. had not been honest with L. M.'s mother about the situation. She said that she and Ms. Greer met with L. M. again on September 22, that L. M. gave them details about the abuse, and that L. M. indicated K. H. and M. H. also had been abused. She said that at some point, she learned K. H. had complained to the police about the defendant on September 7, 1999. She said that in October 1999, she and Ms. Greer spoke with M. H., who told them that the defendant began sexually abusing her when she was six years old and had continued to abuse her until the summer of 1999.

Detective Dyer testified that she went to Annie Harvey's house on December 6, 1999, and talked with Ms. Harvey about the children's allegations. She said that she asked to look around the house but that Ms. Harvey refused. She said that she did not know if the defendant was living with Ms. Harvey at that time but that Ms. Harvey did not want her going through the defendant's personal property. She said that in January 2000, she executed a search warrant at Ms. Harvey's house and that the defendant arrived during the search. She said that she was looking for a box of sex toys, a video camera on a tripod, and photographs of children. She said that she found the box of sex toys, the video camera, and the tripod. She said that Annie Harvey was not cooperative with the police investigation and that Ms. Harvey was protective of the defendant.

On cross-examination, Detective Dyer testified that she did not know when L. M.'s abuse was reported but that it could have been one year before Detective Dyer interviewed L. M. She acknowledged that she asked L. M. to wear a body wire and record a conversation with the defendant. She said that L. M. agreed to wear the wire but that due to scheduling problems, they never got around to it. She acknowledged that pedophiles almost always collect child pornography and that she never found child pornography in the defendant's possession.

Beverly Yoakley Hobson, the defendant's wife, testified that she met and started dating the defendant in September 1997. She said that near the end of 1997, the defendant moved in with her. She said that the defendant worked weekdays from 7:00 a.m. until 6:30 p.m. and that they spent most weekends together. She said that she worked from 7:00 p.m. to 7:00 a.m. three days per week and that she did not know what the defendant did while she was working. She said she became aware of the allegations against the defendant when a police officer telephoned her around Labor Day 1999. She said that the officer asked where the defendant had been on Labor Day and that she told him the defendant had been with her. She said that she married the defendant on July 29, 2000, that she knew the defendant well, that they were close, and that the defendant was honest.

On cross-examination, Mrs. Hobson testified that when she and the defendant started dating, the defendant was still living with Annie Harvey but that he did not live with Ms. Harvey all the time. She said that after the defendant moved out of Ms. Harvey's house, the defendant and Ms. Harvey remained friends but that she did not know if they remained romantically involved. She acknowledged telling a police detective in September 1999 that the defendant sometimes spent the night at Ms. Harvey's house. She also acknowledged that although she knew the defendant did not have access to the children during some of the alleged abuse, she never came forward with that information. She said Sheronda McNeal was lying when Ms. McNeal testified that the defendant dropped off K. H. on Labor Day 1999.

The defendant testified that he was fifty years old and that he moved in with Annie Harvey in 1984. He said that in 1997, Ms. Harvey moved out of their home and went to live with one of Ms. Harvey's daughters for three or four months. He said that about that time, he met Beverly Yoakley. He said that he moved into Ms. Yoakley's home in Columbia, Tennessee in November 1997 and never spent another night in Nashville. He said that after he moved to Columbia, Ms. Harvey moved

back into her house. He said that from the end of 1997 until 1999, he would take Ms. Harvey to work sometimes but that he never spent the night with her.

The defendant testified that he knew L. M., K. H., and M. H. but that he was never in charge of looking after them. He said that he never had a sexual attraction to the girls and that he never molested or had sex with them. Regarding the state's witnesses, he said that it was "just nerveracking to hear this from all of these people coming in, some of them I don't even know." He said he bought L. M. tennis shoes once because her old shoes were worn out. He said that L. M. came to Ms. Harvey's house sometimes but that she did not visit when he was the only person present. He said that L. M. also spent some weekends with Ms. Harvey but that he did not stay at Ms. Harvey's house when L. M. was there. He said that at some point, L. M. asked to move in with Ms. Harvey but that he did not want L. M. living with them. He said L. M. was disrespectful and cursed him because he would not let her out of the house late at night. He said there was never a time when he and L. M. were awake alone at night.

The defendant testified that he never touched L. M. in a sexual way and that he had not seen her since 1996. He said that once in 1996, he and L. M. picked up Ms. Harvey from work. He said that did not happen in 1998 or 1999 as Ms. Harvey had testified. He said that K. H. and M. H. also spent nights at Ms. Harvey's house but that he never touched them. He said that he learned about K. H.'s Labor Day allegations when a detective contacted him at work and that he told the detective he had been with Beverly Yoakley on Labor Day.

On cross-examination, the defendant testified that he did not know why the children had made up the sexual abuse allegations. He said that everything L. M. said was false, that the sexually explicit videotapes and box of sex toys belonged to Annie Harvey, that he had never seen a photograph of Ms. Harvey naked, and that Ms. Harvey was lying when she testified the defendant would stay up at night alone with the children. He said that he and Ms. Harvey were still good friends, that they had a fourteen-year-old daughter together, and that he did not know why Ms. Harvey lied during her testimony. He denied telling a detective in September 1999 that he was living at three residences, including Ms. Yoakley's and Ms. Harvey's homes. However, he acknowledged telling the detective that he did not "play around with kids." He said that after he moved in with Ms. Yoakley, he did not tell her that he continued to have contact with Ms. Harvey.

The defendant acknowledged that Mary Harvey, Annie Harvey's daughter, had accused him of having sexual intercourse with her when she was a juvenile. He said, though, that he never had sex with Mary Harvey. He also acknowledged knowing Sheria Waters, Annie Harvey's niece, and denied having sexual contact with her when she was a juvenile. Finally, he said that he had never offered to pay Sheronda McNeal or Sabrina McNeal, Annie Harvey's nieces, for sex when they were juveniles.

Steven Morgan Vaughn, the Vice President of Levy Wrecking Company, testified that the defendant worked for him and that he had known the defendant for about fifteen years. He said the defendant was a good employee, was truthful, and had an honest reputation. On cross-examination,

he said he did not know the defendant was on trial for having sexually abused three girls. On redirect examination, he said he had never asked the defendant about the charges.

On rebuttal, the state recalled Sheronda McNeal, who testified that the defendant was lying when he said he did not have a sexual interest in children and that the defendant was living at Annie Harvey's house in 1998 and early 1999. Mary Harvey, Annie Harvey's daughter and K. H.'s mother, also testified on rebuttal. She said that she had known the defendant for about fifteen years and that when she was fourteen or fifteen years old, she and the defendant performed oral sex on each other about four times and had sexual intercourse. She said the defendant also took photographs of her naked with an instant camera. She said the defendant told her that if she told her mother, her mother would not believe her.

On cross-examination, Ms. Harvey testified that she told her mother about having sex with the defendant and that her mother was mad and took her to a doctor. She acknowledged that the doctor examined her and that he concluded she had not had sexual intercourse. She said that the doctor was right and that she had lied to her mother about the defendant sexually abusing her. She said, though, that after she saw the doctor, she and the defendant began having sex. She acknowledged meeting with the defendant's attorney one year before trial and three months before trial and telling him both times that she and the defendant never had sex. She said she lied to the attorney because she did not want to talk about having sex with the defendant and because she had thought she had done something wrong. She acknowledged that she loved K. H. and said that she had to give up custody of her daughter in 1995. She said that although Annie Harvey had temporary custody of K. H., K. H. continued to live with her. She said K. H. only went to Annie Harvey's house when Annie Harvey was supposed to be there.

The defendant had been charged with six counts of child rape against L. M., two counts of aggravated sexual battery against L. M., three counts of child rape against K. H., and two counts of aggravated sexual battery against M. H. The jury found him guilty of the lesser included offense of aggravated sexual battery regarding two child rapes against L. M. Those two child rape charges respectively alleged that the defendant had penetrated L. M.'s labia with his foot and that he had penetrated her vagina with his fingers between July 1, 1995, and July 1, 1999. The jury acquitted the defendant of the remaining charges.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his convictions because L. M.'s, K. H.'s, and M. H.'s testimony was incredible and because K. H.'s and M. H.'s testimony contradicted L. M.'s testimony. In addition, he argues that L. M.'s testimony was "more than suspect" because she voluntarily stayed at Annie Harvey's house for years despite the fact that the defendant sexually abused her during every visit and because she "described a man of extraordinary sexual ability." The state claims the evidence is sufficient. We agree with the state.

-7-

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

The jury found the defendant guilty of the lesser included offense of aggravated sexual battery as to counts five and six, child rape against L. M. The elements of aggravated sexual battery relevant to this case are unlawful sexual contact with a victim less than thirteen years of age. T.C.A. § 39-13-504(a)(4). "Sexual contact" is defined as the "intentional touching of the victim's . . . intimate parts if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). In the state's election of offenses, count five specified that the defendant penetrated L. M.'s labia with his foot, and count six specified that the defendant penetrated her vagina with his fingers.

Viewed in the light most favorable to the state, the evidence is sufficient to support the convictions. L. M. testified that when she was about nine years old, the defendant penetrated her labia with his toe twice and that he inserted his fingers into her vagina once. Given that the jury acquitted the defendant of eleven counts and found him guilty of only the lesser included offense of aggravated sexual battery regarding two child rape counts, the jury obviously discredited some of the witnesses' testimony. However, the jury chose to believe L. M.'s testimony that the defendant used his toe and fingers to commit the lesser included offense of aggravated sexual battery. As for the inconsistencies in the witnesses' testimony, the credibility and weight to be given to a witness's testimony are issues to be resolved by the trier of fact, not this court. <u>See</u> <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The evidence is sufficient to support the convictions.

## II. CROSS-EXAMINATION ABOUT DEFENDANT'S PRIOR BAD ACTS

The defendant argues that the trial court erred by allowing the state to impeach him with prior bad acts. He argues that the trial court had properly ruled that the prior bad act evidence was inadmissible under Rule 404(b), Tenn. R. Evid., and that he did not open the door to the cross-examination. The state claims the defendant has waived the issue. In addition, it argues that the defendant opened the door to impeachment during his direct testimony. We conclude that the defense opened the door to impeachment. Moreover, we hold that the defendant waived this issue because he failed to object when the state's cross-examination questions went beyond what the trial court had ruled were permissible.

Before trial, the state filed a notice of its intent to impeach the defendant's testimony with evidence that he solicited Sheronda and Sabrina McNeal, Annie Harvey's nieces, for sex when they were juveniles and that he sexually assaulted Mary Harvey, Annie Harvey's daughter, when she was

a juvenile. Before the state rested its case, it requested a jury out hearing in order for the trial court to determine whether the prior bad act evidence was admissible in its case in chief pursuant to Rule 404(b), Tenn. R. Evid.

During the hearing, twenty-eight-year-old Mary Harvey testified that she had known the defendant for about fifteen years and that she and the defendant had sexual intercourse and performed oral sex on each other when she was fourteen or fifteen years old. Eighteen-year-old Sabrina McNeal testified that the defendant offered to pay her three hundred dollars in exchange for sexual intercourse when she was thirteen years old but that she refused. Sheronda McNeal testified that the defendant offered to pay her fifty dollars in exchange for sex when she was fourteen. Finally, twenty-year-old Sheria Waters, Annie Harvey's niece, testified that the defendant rubbed his feet against her genitals while her clothes were off when she was ten or eleven years old. She also said that at some point after that, the defendant drew a sexually explicit picture, showed it to her, and asked her to have sex with him. The trial court ruled that the proposed testimony was inadmissible propensity evidence. See Tenn. R. Evid. 404(b)(3) (2002).

The state then rested its case, and the defense began presenting its case in chief. After the defendant's direct testimony, the state requested that it be allowed to cross-examine the defendant about his prior bad acts with Mary Harvey, Sabrina McNeal, Sheronda McNeal, and Sheria Waters or that it be allowed to present their testimony on rebuttal. The state argued that the defendant's wife and the defendant had opened the door to the prior bad act evidence by testifying on direct examination that the defendant was not the type of person who would engage in that type of sexual behavior and that he did not have a sexual attraction to L. M., K. H., and M. H. The defense argued that it had carefully questioned the defendant about his sexual attraction only as to the three victims in this case and that it had not opened the door to impeachment.

The trial court agreed with the state and held that the defendant had opened the door to impeachment by his testifying on direct examination that he was not attracted to young girls. The trial court ruled that the state could conduct limited cross-examination as to the defendant's "total disavowal of any attraction towards young people and his reported inclination towards only adult females." However, the trial court stated that the state could not "get into the specifics of other facts that have not been admitted yet." Moreover, it stated that it would determine after the defendant's cross-examination whether the four witnesses could testify in the state's rebuttal case. At the end of the hearing, the following exchange occurred:

> THE COURT: But with just a word to the wise, I think you can cross-examine him, generally, about this denial of any attraction towards anyone, which is what we're here about. . . .
>
> But did you, I believe, understand what I'm trying to say as to this point on the cross-examination?

[Defense attorney]: Judge, if I feel like the question has crossed the line, I intend to object. And I'd appreciate not having a discussion in front of the Jury about the nature of the objection and we all understand --

THE COURT: You won't have. I understand what this is all about.

On cross-examination, the state asked the defendant if he had ever engaged in sexual relations with Mary Harvey, and the defendant said no. The state also asked if the defendant had had sexual contact with Sheria Waters, and the defendant said no. Finally, the state asked if the defendant had ever propositioned Sheronda or Sabrina McNeal for sex, and the defendant again said no. The defense did not object to these questions.

The defendant contends that the trial court erred by ruling that he opened the door to impeachment. Initially, we note that the state claims the defendant waived this issue because he failed to "[make] known to the trial court any disagreement" with the trial court's evidentiary ruling. However, the record reflects that the defense argued to the trial court that it had carefully questioned the defendant about his attraction to the three victims in this case and that the defendant had not opened the door to impeachment. Obviously, the defense disagreed with the trial court's ruling that the state could impeach the defendant's testimony, and we believe the defendant's failing to state that he disagreed with the trial court's ruling did not waive this issue. Therefore, our inquiry will now focus on whether the trial court properly ruled that the defendant opened the door to cross-examination about prior acts with Mary Harvey, Sheronda McNeal, Sabrina McNeal, and Sheria Waters.

We have reviewed the defendant's and Beverly Hobson's testimony and have found no point at which either of them stated that the defendant did not have a sexual attraction to young females. Beverly Hobson testified that she thought the defendant was honest and that she believed him when he told her that he did not abuse the three victims in this case. The defendant testified that he did not have a sexual attraction to L. M., K. H., or M. H., but he never stated that he did not have a sexual attraction to juvenile females. Thus, the trial court was mistaken when it held that the defendant's "total disavowal of any attraction towards young people and his reported inclination towards only adult females" opened the door to cross-examination about his prior bad acts with the four witnesses.

The state argues that even if the trial court improperly ruled the defendant had opened the door to impeachment by stating he did not have an attraction to young females, the defense still opened the door at other points during the trial. The state argues that the defendant opened the door to impeachment by questioning Detective Kristin Dyer about the fact that no evidence of pedophilia was found in Annie Harvey's home. In addition, the state claims that the defendant opened the door to impeachment when he acknowledged on cross-examination that he had told a detective, "I don't play around with kids."

As to the state's claim that the defendant opened the door to impeachment by acknowledging that he told a detective he did not play around with children, this court has stated that "the State cannot ask a witness an irrelevant but prejudicial question, and then, under the theory of impeachment, predicate a second irrelevant and prejudicial question upon defendant's response to the question." Hatchett v. State, 552 S.W.2d 414, 415 (Tenn. Crim. App. 1977). We believe that the state asked the question with the pretense of later impeaching the defendant with prior bad acts involving Mary Harvey, Sheronda McNeal, Sabrina McNeal, and Sheria Waters. Therefore, the state cannot now claim that the defendant opened the door to impeachment.

Regarding the defense's questioning of Kristin Dyer, the defense asked Detective Dyer if pedophiles usually collected child pornography, and she said yes. The defense then asked her if she found any child pornography in the defendant's possession, and she said no. Obviously, the defense asked these questions in order to show that the defendant was not a pedophile. We believe this line of questioning opened the door to the issue of the defendant's character, i.e., his sexual attraction to children. See, e.g., State v. Raymond Writer, No. E2001-01062-CCA-R3-CD, Sullivan County (Tenn. Crim. App. June 10, 2003), app. denied (Tenn. Oct. 27, 2003) (holding that a defense witness's stating during direct examination that the defendant had never shown signs of being a child molester "opened the door to the issue of a pertinent character trait, namely the defendant's propensity for molesting children").

We note, though, that once the defense opened the door, the state chose to cross-examine the defendant, rather than the detective, about specific acts. Rule 405, Tenn. R. Evid., provides that character witnesses may be cross-examined about a defendant's specific instances of conduct. Thus, according to Rule 405, the state should have cross-examined Detective Dyer about the defendant's prior acts with the four witnesses. On the other hand, case law demonstrates that cross-examining a defendant about specific instances of conduct when a witness opens the door to character evidence also has been allowed. See State v. Patton, 593 S.W.2d 913 (Tenn. 1979) (noting that a psychiatrist's testimony opened the door to the state's being able to cross-examine the defendant about specific instances of conduct); State v. Nichols, 877 S.W.2d 722 (Tenn. 1994) (holding that the state could cross-examine the defendant about a prior bad act in order to rebut the defense witnesses' testimony about the defendant's docile nature); see generally State v. Harold Tolley, No. 03C01-9811-CR-00386, Unicoi County (Tenn. Crim. App. Jan 14, 2000), app. denied (Tenn. Sept. 5, 2000) (holding that because the defendant opened the door to his character for peacefulness during his cross-examination of a state witness, the state could cross-examine the defendant about a specific bad act).

In any event, regardless of whether the state's cross-examining the defendant rather than Detective Dyer was proper, the defendant cannot prevail in his claim. In its ruling, the trial court held that the defense had not yet opened the door to specific acts and that the state could conduct only a limited cross-examination of the defendant's "total disavowal of any attraction towards young people." The court asked the defense if it understood this ruling, and the defense stated that it did. Moreover, the defense told the trial court that it would object if the state asked the defendant any improper questions. During the state's cross-examination of the defendant, the defense did not

object when the state asked him about engaging in sexual conduct with Mary Harvey and Sheria Waters or propositioning Sheronda and Sabrina McNeal. The failure to object contemporaneously constitutes a waiver of the issue pursuant to Rule 36(a), T.R.A.P.

## III. REBUTTAL WITNESSES

The defendant claims that the trial court erred by allowing Mary Harvey and Sheronda McNeal to testify on rebuttal. He argues that their testimony was inadmissible under Rule 404(b), Tenn. R. Evid., because the trial court had ruled earlier that the prejudicial effect of the evidence outweighed its probative value. In addition, he argues that their testimony was inadmissible pursuant to Rule 608(b), Tenn. R. Evid., because Rule 608(b) prohibits the use of extrinsic evidence to show a defendant's character. The state claims that the trial court properly allowed the witnesses to testify. We conclude that the trial court committed reversible error by allowing Ms. Harvey and Ms. McNeal to testify.

After the defense rested its case in chief, the state argued that the defendant had opened the door to the four women's testimony. The trial court ruled that pursuant to Rules 404 and 405, Tenn. R. Evid., some of the witnesses could testify in the state's rebuttal case. The trial court determined that the defendant had opened the door to the evidence when he testified that he did not have an attraction to young people and that L. M., K. H., and M. H. were lying. The trial court also held that Steven Morgan Vaughn's testimony about the defendant being honest and truthful also opened the door to the rebuttal evidence. The trial court stated,

> I believe that in terms of the 608 analysis that the defendant was asked about behavior yesterday when he was on the witness stand. He denied the behavior. And . . . I don't believe that that particular rule would provide the state an opportunity, now, to bring in extrinsic evidence on those questions that were asked the defendant.
>
> . . . .
>
> So I think the defendant, by introducing evidence through his employer, Mr. Vaughn, of the defendant's reputation for truthfulness, which it is primarily what it went to, goes to the credibility of this defendant. And the defendant's testimony, himself, that is very adamantly denying any inclination towards any sexual activity with children goes to the issue of credibility, which is the main issue in this trial.
>
> And so the Court is of the opinion that this opens the door to the state to introduce the witnesses having to do with this credibility question. . . . [Under] 404(a) and 405 that -- that some limited testimony could be allowed to -- to counter that issue of truthfulness.

-12-

I will give the Jury a limiting instruction about the only way they can consider this. I will tell the jury that they cannot consider this testimony as to the defendant's guilt in this particular case . . . but only as to his credibility as a witness.

. . . .

So what I'm saying, the best way I know how to say it, is that I do think that some of this as to credibility, after balancing it, has probative value that outweighs the prejudice, where truthfulness, credibility is the central issue. So I'm going to ask -- I'm going to instruct the state to call a witness or two on that subject . . . .

The trial court ruled that Mary Harvey could testify about the sexual relationship she had with the defendant when she was a juvenile. The state then asked the trial court if Sheronda McNeal also could testify. The state told the trial court that it would question Ms. McNeal only as to her opinion about the defendant's "character for truthfulness, as it relates to the issue of denying sexual interest in children." The trial court agreed and ruled that Ms. McNeal could give her opinion. In the state's rebuttal proof, Sheronda McNeal testified that she had known the defendant for a long time and that in her opinion, the defendant was not truthful when he testified that he did not have a sexual interest in children. Mary Harvey then testified that she and the defendant had sexual intercourse and performed oral sex on each other when she was a juvenile. Before their testimony, the trial court had instructed the jury that it could only consider the evidence for the purpose of determining the defendant's credibility.

Initially, we note that the trial court stated it was admitting Mary Harvey's rebuttal testimony pursuant to Rules 404(a) and 405. However, while character witnesses may be cross-examined about specific acts under these rules, "extrinsic evidence of specific acts is barred." Neil P. Cohen et al., Tennessee Law of Evidence, § 4.05[4][e], at 108 (4th ed. 2000). Thus, we conclude that the trial court erred by allowing Mary Harvey to testify in the state's rebuttal case about her sexual relationship with the defendant.

We also conclude that Sheronda McNeal's testimony was inadmissible. The trial court had ruled that Ms. McNeal could testify on rebuttal about the defendant's "character for truthfulness, as it relates to the issue of denying sexual interest in children." However, as we stated previously, the defendant denied being sexually attracted to L. M., K. H., and M. H., but he never said that he did not have a sexual interest in children. Thus, the trial court was mistaken when it held that the defendant's denial of a sexual interest in children opened the door to character evidence. In any event, even if he had made such a statement, Ms. McNeal's testimony went outside the purview of admissible opinion testimony. Pursuant to Rule 404(a)(1), once the defendant takes the stand and opens the door to his character, as the defendant did in this case, the prosecution can attack his character for truthfulness. See also Tenn. R. Evid. 404(a)(3), 608(a); Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[4][c], at 70 (4th ed. 2000). However, Ms. McNeal's rebuttal testimony did

not relate to the defendant's character for truthfulness. Instead, she merely stated that the defendant lied during his testimony. See State v. Edward H. Jones, No. 03C01-9301-CR-00024, Knox County (Tenn. Crim. App. Sept. 15, 1994) (holding that because expert's testimony related to witness's truthfulness on a particular occasion instead of the witness' character for truthfulness pursuant to Rule 608, Tenn. R. Evid., the evidence was inadmissible). The weight and credibility of a witness' testimony are matters entrusted exclusively to the jury as the trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984).

In conclusion, we hold that the trial court erred by allowing Ms. Harvey and Ms. McNeal to testify on rebuttal. Moreover, given the nature of their testimony, we conclude that the error more probably than not affected the judgments to the defendant's prejudice. T.R.A.P. 36(b). Thus, the defendant's convictions are reversed and the case is remanded for a new trial.

## IV. CLOSING ARGUMENT

The defendant claims that the trial court erred by refusing to give a curative instruction after the prosecutor improperly instructed the jury on "reasonable doubt" during closing argument and shifted the burden of proof to the defense. The state argues that although the prosecutor may have misspoken during closing argument, the defendant has failed to show that he was prejudiced by the prosecutor's statements and that, in any event, the trial court properly instructed the jury as to the burden of proof. We conclude that the defendant is not entitled to relief on this issue.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining whether the state's conduct could have improperly prejudiced the defendant and affected the verdict:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

See also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

During his closing statement, the prosecutor said the following:

The Court will instruct you that a reasonable doubt is a doubt based on reason and common sense. It is something that when you go home at night and feel comfortable in your hearts deciding that Mr. Hobson did these things, you know in your hearts, after listening to those four people tell about what happened to them at his hands, that this man committed these offenses.

After the prosecutor finished his argument, the defendant's attorney asked that "some form of the jury instruction be -- a sentence or phrase be added that the Jury does not have to be comfortable with innocence." The trial court refused, stating that it would properly instruct the jury as to reasonable doubt during the jury charge.

Initially, we note that both the defendant's and the state's briefs allege that the defendant objected to the prosecutor's statements. However, our review of the record reveals that the defendant did not make a contemporaneous objection to the prosecutor's statements. Moreover, even when the defense pointed out the prosecutor's error and asked for a jury instruction, it did not state that it was objecting to the prosecutor's closing argument. The failure to object contemporaneously constitutes a waiver of the issue pursuant to Rule 36(a), T.R.A.P. See State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged misconduct during closing argument waives any later complaint). Moreover, we discern no plain error because the trial court properly instructed the jury that the state had the burden of proving the defendant's guilt beyond a reasonable doubt and that reasonable doubt is

that doubt engendered by an investigation of all proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean doubt that may arise from probability. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

See Tenn. R. Crim. P. 52(b). The defendant is not entitled to relief.

-15-

## V. JURY'S EXPOSURE TO EXTRANEOUS INFORMATION

Finally, the defendant claims that the trial court erred by refusing to grant him a new trial. He contends that a new trial is warranted because two juror affidavits submitted with his new trial motion demonstrate that the jury convicted him based upon the jury foreman's incorrectly telling other jurors that he would serve only probation if the jury convicted him of the lesser included offense of aggravated sexual battery. He claims that the jurors should have been allowed to impeach their verdict and that the trial court improperly denied his motion for a new trial based upon the jury's exposure to the extraneous information. The state responds that pursuant to Rule 606(b), Tenn. R. Evid., and Tennessee case law, the trial court properly denied the defendant's motion for a new trial. We agree with the state.

In his motion for a new trial, the defendant claimed that during jury deliberations, the jury foreman, a Department of Correction (DOC) employee, told fellow jurors that the defendant would serve only probation for two aggravated sexual battery convictions. He argued that he was entitled to a new trial because the jury convicted him based only upon the foreman's misinformation. To support his claim, the defendant attached affidavits from two jurors. In both affidavits, the jurors stated that they believed the defendant was innocent of any crime against L. M.; that they found the defendant guilty of two counts of aggravated sexual battery "just in case Mr. Hobson had actually touched [L. M.] in an inappropriate manner" and because they wanted him listed on the sexual offender registry; and that they found him guilty because the jury foreman told them the defendant "would probably just get probation for one or two years" for the aggravated sexual battery convictions.

At the motion for new trial hearing, the defendant argued that State v. Fuino, 608 S.W.2d 892 (Tenn. Crim. App.), app. denied (Tenn. 1980), supported his claim that the affidavits were admissible to impeach the verdict. In Fuino, jurors submitted affidavits stating that they would not have convicted the defendant of first degree murder if they had known he would have to serve a life sentence. The trial court refused to consider the affidavits and denied the defendant's new trial motion. On appeal, this court first noted that the trial court had failed to inform the jury that the jury would have to sentence the defendant to death or life imprisonment if it found the defendant guilty. It then determined that the juror affidavits contained proof that the jurors had been influenced by extraneous prejudicial information and by misrepresentation and mistake. This court reversed the defendant's conviction and ordered a new trial. In the present case, the trial court noted that despite Fuino, more recent "case law interpreting Rule 606(b) . . . [indicates] that matters such as brought forth by the affidavits in this case do not provide a valid basis for impeaching a jury's verdict." It overruled the motion for new trial.

The defendant maintains that this case is analogous to Fuino and that Fuino is still good law. In addition, he contends that State v. Akins, 867 S.W.2d 350 (Tenn. Crim. App. 1993), is dispositive. In Akins, the defendant was charged with several offenses, including driving under the influence (DUI). During voir dire, Juror Hathaway failed to reveal that she had worked as a probation officer and a DUI counselor, despite direct questions from the state and the defense that should have

revealed such information. After trial, another juror told the defense about Ms. Hathaway's prior experience with alcoholics, and the defendant called Ms. Hathaway to testify at his motion for new trial hearing. On appeal, the state argued that Ms. Hathaway's testimony could not be considered under Rule 606(b). However, this court held that her testimony could be considered and that her failure to reveal her prior experience denied the defendant his constitutional right to a fair and impartial jury. Id. at 355-57.

Tennessee Rule of Evidence 606(b), which came into effect in 1989, governs a juror's competency to testify regarding the validity of the verdict.

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotion as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

As the Advisory Commission Comment notes, this rule is the codification of the supreme court's adoption of Rule 606(b), Fed. R. Evid., in State v. Blackwell, 664 S.W.2d 686, 688 (Tenn. 1984). Both fact and opinion can comprise extraneous information influencing a jury. Blackwell, 664 S.W.2d at 689. If the defendant shows that the jury has been subjected to extraneous prejudicial information or improper influence, then we presume prejudice and the burden shifts to the state to rebut this presumption by either explaining the exposure or proving that it was harmless. Id.

Regarding the defendant's argument that this case is analogous to Fuino and that Fuino is still good law, we agree that the facts of Fuino are similar to the case before us. Moreover, we recognize that in Fuino, this court held that the jury foreman's mistakenly telling other jurors that the trial court would not sentence the defendant to life imprisonment was extraneous prejudicial information. However, in reversing Mr. Fuino's conviction, this court emphasized that in addition to the foreman's misinformation, the trial court also gave an incorrect jury instruction, which contributed to the other jurors' believing the foreman. Id. at 895-96.

We also recognize that since Fuino, this court and our supreme court have held that the type of information revealed by the jury foreman in that case was not extraneous prejudicial information. For example, in State v. Anderson, 748 S.W.2d 201, 205 (Tenn. 1985), our supreme court held that a juror's telling other jurors that the defendant would be eligible for parol after serving only thirty

years of a life sentence was not extraneous information under Fed. R. Evid. 606(b). In <u>State v. McAffee</u>, 784 S.W.2d 930, 933 (Tenn. Crim. App. 1989), this court held that a juror's stating during deliberations that the defendant would only serve six years for a first degree murder conviction was not extraneous prejudicial information. Finally, our supreme court has stated that jurors are "generally knowledgeable in many areas, and they are entitled to use their common or acquired sense in arriving at a verdict, so long as the knowledge is not imparted to them outside the judicial proceeding in which they sit as jurors." <u>Anderson</u>, 748 S.W.2d at 205. We conclude that case law since <u>Fuino</u> demonstrates that information brought into the jury room by a juror's work experience does not constitute extraneous prejudicial information.

Turning to the case before us, the jurors' affidavits do not allege that the jurors learned about the mistaken information from a third party during the trial or deliberations. To the contrary, the jurors obtained the information from the jury foreman, who learned the information from his experience as a DOC employee. Although the defendant claims <u>Akins</u> is dispositive, we note that <u>Akins</u> is distinguishable from the present case. In <u>Akins</u>, this court merely stated that Rule 606(b) does not preclude testimony about voir dire. We also note that unlike the trial court in <u>Fuino</u>, the trial court in this case instructed the jury that the trial court would determine the defendant's punishment at a separate sentencing hearing upon a finding of guilt. Choosing to follow the reasoning in <u>Anderson</u> and <u>McAfee</u>, we conclude that the jurors' affidavits did not reveal any extraneous information and that the trial court properly denied the defendant's motion for new trial.

We conclude that the trial court erred by allowing Mary Harvey and Sheronda McNeal to testify on rebuttal about the defendant's prior bad acts and character for truthfulness. The defendant's convictions are reversed, and the case is remanded for a new trial.

 

 

_____
JOSEPH M. TIPTON, JUDGE